Rowland H. Edwards v. Commissioner.
Edwards v. Commissioner
Docket No. 71257.
United States Tax Court
T.C. Memo 1959-154; 1959 Tax Ct. Memo LEXIS 93; 18 T.C.M. (CCH) 667; T.C.M. (RIA) 59154; 10 Oil & Gas Rep. 1153; July 31, 1959
J. B. Fisher, Esq., Kanawha Valley Building, Charleston, W. Va., for the petitioner. Bart A. Brown, Jr., Esq., for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income *94 taxes of petitioner for the taxable year 1954 in the amount of $3,169.62, and for the taxable year 1955 in the amount of $9,820.11. The issues for decision are: (1) Whether the fair market value of property received by petitioner as a liquidating dividend was in excess of $37,793.10; and (2) Whether reasonable allowances for depreciation and depletion of the property received in liquidation were in excess of $763.29 and $1,560.54, respectively, for the taxable year 1954, and $3,053.16 and $4,823.95, respectively, for the taxable year 1955. Findings of Fact Petitioner, Rowland H. Edwards, is an individual whose residence and place of business are at Welch, McDowell County, West Virginia. He filed timely individual income tax returns for the calendar years 1954 and 1955 with the district director of internal revenue at Parkersburg, West Virginia. During the period from January 1 to September 30, 1954, Edwards acquired 60.123 per cent of the capital stock of the Little Indian Natural Gas Company at a cost of $81,300. The Little Indian Natural Gas Company (hereinafter referred to as the Company), was incorporated under the laws of West Virginia on May 5, 1950. Its principal business *95 activity was prospecting for and developing oil and gas resources. Prior to 1952, the Company acquired a leasehold covering 458 acres in McDowell County, West Virginia. Between 1952 and September 30, 1954, it drilled three wells on the leasehold. The cost of drilling each of the wells and the allocation of the cost made by the corporation between tangible assets and intangible drilling costs were as follows: Allocation of Cost
Tangible
Intangible
Well No.
Drilled
Total Cost
Assets
Assets
2
1952
$46,542.17
$20,277.22
$26,264.95
3
1953
45,667.92
14,313.56
31,354.36
4
September, 1954
44,524.62
16,026.58
28,498.04
In addition to the wells drilled by September 30, 1954, the 458 acres had an additional value of $0.75 per acre annually for the right to develop undeveloped mineral resources. Costs of tangible assets to be used for drilling increased 40 to 45 per cent from the period 1952 to 1958. In the years 1953 and 1954 alone, the increase was at the rate of 7 per cent a year. The tangible assets had an unexpected useful life of 15 to 17 years, with an over-all salvage value at the end of that period of $5,061.74. These *96 same assets, if removed from their present locations within the first five years of installation, could be used again in other wells. The value of these assets, if used in other wells, would be approximately 60 per cent of their replacement cost, or $32,674.87, on September 30, 1954. No drillings have been made on the leasehold since that date. Estimated recoverable units from leasehold through the lifetime of the wells were 850,000,000 cubic feet of natural gas. Total production from the leasehold up to October 1, 1954, was 216,831,000 cubic feet so that the estimated reserves of the three wells on September 30, 1954, were 633,169,000 cubic feet. On December 19, 1951, the Company entered into a written agreement with Godfrey L. Cabot, Inc., (hereinafter referred to as Cabot), a Massachusetts corporation of Boston, Massachusetts, wherein it agreed to sell to Cabot all of the natural gas produced by the Company. The agreement provided, in part, as follows: "1. The Vendor will sell and the Vendee will buy, all of the NATURAL GAS which can or may be produced and delivered, excepting as hereinafter set forth and excepting that amount of gas which is actually needed and used for drilling *97 and operating * * *. "2. The price to be paid for the gas hereby sold shall be fifteen (15() cents per thousand cubic feet measured by suitable meters on a ten (10) ounce pressure basis above 14.7# atmospheric pressure, according to Boyle's Law for the measurement of gas at varying pressures and on 60degree F. as a basic temperature and 29.3 inches of mercury as a basic barometric pressure, but without allowance for barometric variations. In the absence of a record of flowing temperature a flowing temperature of 60degree F. shall be assumed. If and when Vendee shall receive an increase in the price at which he sells the gas at Glasgow, W. Va. under contract with Hope Natural Gas Co., dated October 23, 1924 sixty (60%) per cent of such increase will be added to the price paid to the Vendor by the Vendee under this agreement. "3. The Vendee will construct a suitable ( ) pipe line from its present pipe line system to a point to be mutually agreed upon near Vendor's first commercially productive well on the said lease proposed to be drilled at a point approximately 2400 feet from Vendee's Pocahontas Land Corp. well #63, at which point the Vendee will install and maintain a suitable *98 recording meter. The necessary connections from the wells to this meter shall be provided by the Vendor. The Vendee shall operate and maintain said meter and shall use due diligence to keep said meter in proper working order, so that the gas furnished may be accurately measured. Upon giving ten (10) days' written notice, the Vendor, or his representative, may inspect or test said meter, or he may require said meter to be tested or repaired by the Vendee to the satisfaction of the Vendor. If, however, the Vendor requires any meter to be tested and such meter proves to be correct within 3%, the Vendor shall pay for the cost of the test. During such time as any meter is found to be not within 3% correct or is being tested, the gas taken shall be estimated until the repaired meter is installed and adjustments and settlements shall be made at the regular monthly periods on the basis of the amount of gas registered at like pressures for like periods of time when the meter was registering accurately if more exact adjustment is not determined by test and the inspection of records of gas delivered as indicated by meter. * * *
"7. This agreement shall embrace all wells now drilled, or *99 to be drilled, on the above named property The Vendor will construct all the necessary gathering lines to connect any gas wells producing gas in commercial quantities now drilled, or which may hereafter be drilled upon the property described and subject to this agreement except as provided in item 3 hereof. All gas producing wells on the property embraced in this agreement shall remain continuously connected to the gathering lines in order that the wells may at all times be in readiness to produce into said lines, excepting that the Vendor reserves the right to disconnect any well or wells from said lines on account of abandonment, or for the purpose of cleaning out, or repairing, or drilling deeper, but only for the time actually needed for promptly attending to such work. This covenant shall not interfere in any way with the Vendor's production of oil." Pursuant to the above agreement, Cabot paid the Company $.17082 per 1,000 cubic feet of natural gas produced on the leasehold, and has continued to pay the same price to the date of trial. The total receipts, net operating profit before depreciation and depletion, net profit, and net operating loss deductions of the Company for *100 the taxable years 1952, 1953, and the period January 1, 1954, to September 30, 1954, were as follows: Net Operating Profit
Total Re-
Before Depreciation
Net Profit
Net Operating
Year
ceipts
and Depletion
(or Loss)
Loss Deduction
1952
$ 4,100.73
$ 900.94
$ 39.42
$29,343.79
1953
17,604.97
12,225.45
3,485.75
29,304.37
January 1, 1954 to
13,127.18
6,739.36
(708.27)
25,818.62
September 30, 1954 As of October 1, 1954, the expected recoverable reserves from the leasehold of approximately 633,000,000 cubic feet to be recovered over a remaining period of fifteen years could be expected to yield, on the basis of $0.17 per thousand cubic feet, a gross amount of approximately $95,000. On October 1, 1954, the Company was liquidated and, in return for Edwards's stock therein, there was conveyed to him a 60.123 per cent undivided interest in all the corporation's assets, which consisted chiefly of the leasehold containing the three producing wells and cash. Respondent computed the value of Edwards's share of the leasehold interest based on the production estimates for the remaining expected life of the wells as follows: Edwards's
Ultimate Net
Fair
Value
Estimated
Interest
at 0.12/mcf
Market
Fair
Before
Market
Production
60.163%
Depreciation
Discount
Value
and
Year
(mcf)
(mcf)
Depletion
at 8%
Mineral
Mineral
Production to
215,364
10-1-54
10-1-54 - 10-1-55
90,000
54,146.70
$ 6,497.60
0.926
$ 6,016.78
10-1-55 - 10-1-56
75,000
45,122.25
5,414.67
0.857
4,640.37
10-1-56 - 10-1-57
65,500
39,406.77
4,728.81
0.794
3,754.68
10-1-57 - 10-1-58
62,500
37,601.88
4,512.23
0.735
3,316.49
10-1-58 - 10-1-59
55,000
33,089.65
3,970.76
0.681
2,704.09
10-1-59 - 10-1-60
47,500
28,577.43
3,429.29
0.630
2,160.45
10-1-60 - 10-1-61
40,000
24,065.20
2,887.82
0.583
1,683.60
10-1-61 - 10-1-62
37,500
22,561.13
2,707.34
0.540
1,461.96
10-1-62 - 10-1-63
32,500
19,552.98
2,346.36
0.500
1,173.18
10-1-63 - 10-1-64
27,500
16,544.83
1,985.38
0.463
919.23
10-1-65 - 10-1-66
25,000
15,040.75
1,804.89
0.429
774.30
10-1-66 - 10-1-67
22,500
13,536.68
1,624.40
0.397
644.89
10-1-67 - 10-1-68
20,500
12,333.42
1,480.01
0.368
544.64
10-1-68 - 10-1-69
17,500
10,528.53
1,263.42
0.340
429.56
10-1-69 - 10-1-70
12,500
7,520.38
902.45
0.315
284.27
Totals
631,000
379,628.58
$45,555.43
$30,508.49
*101 The $0.12 per thousand cubic feet used by the respondent in his computation of "ultimate net value" before depreciation and depletion was an approximation of actual net profit per unit determined by the respondent from an examination of the petitioner's tax returns. Subsequent to the liquidation, Edwards received, as his share of the net income from the undivided interest as reported by him for the period 1954 through 1957, the following net income: Net Income Before
Depreciation and
Period
Units Sold
Depletion
1954
17,730 MCF
$ 2,282.31
1955
56,514 MCF
6,722.47
1956
44,042 MCF
5,218.25
1957
38,249 MCF
4,503.45
Totals
156,535 MCF
$18,726.48
For his 1954 and 1955 returns, Edwards took the basis of the stock of the Company, $80,527.08, as the basis for the assets received in liquidation of the Company, and for the years in question he computed the depreciation and depletion allowances for tax purposes as follows: 1954
Depreciation 1/4 of 10% of $80,527.08 = $2,013.18
Depletion $80,527.08 (cost) / 267,506 (Est. Unit
= $7,349.91
reserve, 10-1-54) X 17,730 (units sold)
1955
Depreciation 10% of $80,527.08 = $8,052.71
Depletion $75,190.35 (remaining cost, 1-1-55) / 249,776
= $17,010.71
(remaining units, 1-1-55) X 56,514 (units sold)
*102 Respondent determined that the fair market value of the assets in addition to cash received by Edwards in the liquidation of the Company was $37,793.10 on September 30, 1954, the date of liquidation, and that he realized a long-term capital loss in the amount of $43,033.98. Respondent allocated $30,508.49 of the value to the mineral interest received in liquidation, and $1,269.91 to the interest in the tangible equipment received in liquidation. Reasonable allowances for depreciation and depletion were determined to be $763.29 and $1,560.54, respectively, for the year 1954, and $3,053.16 and $4,823.95, respectively, for the year 1955. The value of Edwards's share in the undivided gas and oil reserves, in the tangible assets, and the underlying mineral interest received in liquidation of the Company on September 30, 1954, was not in excess of $37,793.10. Petitioner sustained a long-term capital loss in the amount of $43,033.98 in 1954 from the distribution in liquidation of the Company. Reasonable allowances for depreciation and depletion are $763.29 and $1,560.54, respectively, for the taxable year 1954, and $3,053.16 and $4,823.95, respectively, for the taxable year 1955. *103 Opinion While in his returns for 1954 and 1955 petitioner took the basis of his stock in the Company as his basis for the assets received in liquidation, the basis of that property in his hands is its fair market value at the time of the distribution in liquidation. Sec. 334, Internal Revenue Code of 1954. The petitioner does not claim otherwise. It is this fair market value which is the heart of the instant controversy, the respondent having determined it to be $37,793.10 while the petitioner claims on brief that he has established by his evidence a value of not less than $59,879.83. The value in question determines the amount of loss sustained by the petitioner. Sec. 1001, 1954 Code. However, since the loss involved is a long-term capital loss the petitioner would be limited, in any event, to a deduction of $1,000 in each of the taxable years 1954 and 1955. Secs. 1211, 1212, 1954 Code. Therefore, of more critical significance is the fact that the smaller value assigned to the property by the respondent results in substantially smaller allowances for depreciation and depletion than those claimed by petitioner. Petitioner asserts that the value of the mineral *104 rights received in liquidation of the Company exceeded $36,700. Respondent determined the value of those rights to be $30,508.49. Petitioner disagrees with this valuation on the grounds that, first, respondent determined the net value per thousand cubic feet of natural gas to be $0.12, whereas the actual sales price of the gas was about $0.17 at the time of the liquidation; and, secondly, that the respondent discounted the value so determined at the rate of eight per cent, whereas petitioner claims that four per cent would be a more appropriate discount rate. Petitioner's evidence shows that total receipts, after deducting the one-eighth royalty, would be about $95,000 of which his share was roughly 60 per cent, or a total of $57,000. This total represents the amount to be collected by petitioner over a period of fifteen years in decreasing amounts each succeeding year. The amount so determined is not diminished by the cost of operation, and, therefore, represents the gross value of the mineral right but not the net value. The sales price of $0.17 per thousand cubic feet represents the gross receipts undiminished by the one-eighth royalty obligation. Petitioner objects to the use *105 of $0.12 per thousand cubic feet on the basis that it represents only the actual net value before depreciation and depletion of the minerals received by him for the years subsequent to the liquidation and is not based on any expected net value prior to or at the time of the liquidation. However, sales prior to liquidation manifestly produced no net income because there was a loss from operations in the first years of production. Petitioner has not shown what was expected to be the average rate of expenses in relation to receipts. In fact, no evidence was introduced to indicate that the minerals would or were expected to produce a net value to petitioner at the time of the liquidation. Therefore, we find no basis in the evidence for holding the respondent's use of $0.12 per thousand cubic feet to have been erroneous. Petitioner objects to respondent's use of the eight per cent discount rate because it represents the average risk rate in the oil and gas industry, thus including in the average both producing and nonproducing wells. The number of wells drilled and the anticipation of additional drillings, the position of the particular field in relation to other natural surroundings, *106 such as water and geological formations, all would affect productivity and the actual risk rate. Respondent admittedly did not attempt to relate the average risk rate to the particular wells here in use. Petitioner, however, seeks to overcome the use of the average risk rate by the assertion that four or six per cent is more appropriate to a producing well. In support of this position, he cites Seneca Coal Mining Co., 2 B.T.A. 513 (1925), wherein we recognized the use of Hoskold's tables. However, in that case the facts indicate that the actual discount factor used was eight per cent, as here, and that this rate was combined with a calculation of a sinking fund invested at the rate of four per cent over the period of recovery. In addition, we have not hesitated to reject the use of the Hoskold formula where the table is not applicable to the facts of the case. J. J. Gray, Jr., 2 B.T.A. 672 (1925). Whatever the usefulness of Hoskold's formula may be in many situations, it is widely accepted that its utility is at best uncertain in the valuation of oil and gas properties. This proposition has been well-expressed as follows (Mertens, Law of Federal Income Taxation, *107 Vol. 10, sec. 59.91): "The Hoskold tables are ideally adapted only to the valuation of properties the earnings of which are expected to be reasonably uniform from year to year. While that is often true in the case of many mines in normal times, and while it may prevail for periods of a few years in the case of oil wells under modern proration methods, the preponderant behavior of oil and gas wells is directly the opposite of steadiness and uniformity. Not only does the production decline in volume, rapidly at first and then more slowly, but the costs of both development and operation vary widely from year to year during the decline. For this reason the present worth of oil and gas properties is customarily found by applying separately to each future year's expected earnings an ordinary compound discount factor, representing the amount of money which will have increased to one dollar in that future year if invested on the date of valuation at compound interest at a selected rate commensurate with the hazards of the business, usually 8% or 10%. The sum of the discounted earnings for all years is taken to be the present worth of the aggregate future earnings of the property. * * *" *108 This recommended method of valuation is exactly that employed by the respondent in the instant case. From the facts before us, we do not know whether petitioner's wells were average in risk or less risky than average and thereby possibly subject to a lower discount rate than that used by respondent in his computations. No evidence was introduced concerning natural conditions of the area, nor was there any showing that the risk rate generally applied to producing wells in that area was any different than the average for the industry. The determination of the respondent is prima facie correct and casts upon the petitioner the burden of disproving it. See Avery v. Commissioner, 22 Fed. (2d) 6 (C.A. 5, 1927); Rule 32, Tax Court Rules of Practice.Petitioner has failed to introduce any evidence which would establish that respondent's determination in this regard is incorrect. We note, however, that respondent computed the fair market value of petitioner's interest in the assets distributed by applying a 60.163 per cent value to the estimated annual production of natural gas, whereas we have found as a fact that petitioner's interest was 60.123 per cent of the assets distributed. *109 The difference of 0.04 per cent resulted in a determination of a greater value for petitioner's interest than he in fact received, and a capital loss of a lesser amount. The proper computation of petitioner's interest would result in a lesser figure than that allowed by respondent. The respondent, however, has not claimed any increased deficiency. Therefore, we have found from the evidence that the value of the mineral interest received by petitioner on September 30, 1954, was not in excess of $30,508.49. Respondent alleges that the tangible assets received by petitioner in liquidation do not have a value in excess of the discounted salvage value. The salvage value was estimated to be $5,061.74, and the discounted value, to the date of September 30, 1954, was estimated to be $1,269.91. Petitioner introduced evidence that the tangible assets had a value of approximately 60 per cent of their replacement value, or $32,674.87, of which his interest would be $19,645.11. Respondent does not dispute petitioner's evidence but argues that in determining the value of mineral deposits, no separate value should be assigned to depreciable property, because such allowance would result in a double *110 allowance for the value of the capital asset. He argues that the value of the depreciable property is actually recovered through the valuation of the minerals. This was in fact accomplished by respondent in his computation of mineral interests. The value of $0.12 per thousand cubic feet represents the value of interest before diminution by depreciation and depletion. Necessarily the determined value must include the value of the depreciable asset otherwise the determined value would have to be based on a per cubic value less than $0.12 per 1,000 cubic feet. However, respondent argued on brief that the salvage value should be assigned only the present value of the $5,061.74 to be received in fifteen years, discounted at six per cent which would be $1,269.91 for petitioner's interest. The expert who testified on behalf of respondent stated on examination as follows: "Q What in your opinion is the percentage of the value of these tangible assets that a willing buyer would pay for these assets as of the critical date? "A No more than ten percent. "Q And that would be representative by the salvaged value? "A Right. "Q Then in your opinion the maximum fair market value of Mr. *111 Edwards interest in the leasehold as of September 30, 1954 was $30,508.49 plus ten percent of the value of the tangible assets? "A That is correct. "Q And in your opinion such amount is Petitioner's total basis in the leasehold? "A That is correct. "Q This is what you believe a reasonably prudent buyer would pay for Mr. Edwards' interest in this property as of September 30, 1954? "A That is correct." The above testimony is the only evidence available which bears upon the valuation of the salvageable tangible assets. In the light of the testimony, we cannot find that the value assignable to petitioner's interest in tangible equipment should be more than $5,061.74. Evidence was submitted by petitioner that the leasehold value should include the value of the right to develop the undeveloped mineral resources of the property. Such right is normally valued at about $0.75 per acre annually. Petitioner's share of this value would be $2,296.09. Respondent objects to the inclusion of any amount for the value of the undeveloped mineral resources on the ground that no new wells or further developments were contemplated. He bases this conclusion on the fact that no new development *112 had taken place since September 1954. However, even if such value were admitted by respondent, the total value of mineral interest, salvage value of tangible assets, and undeveloped mineral rights would not exceed the total fair market value of $37,793.10 as determined by respondent. On the basis of that determination, petitioner realized a capital loss from the distribution in liquidation of the Company at least in the amount of $43,033.98 in the calendar year 1954. Reasonable allowances for depreciation and depletion were determined on the basis that the depreciable interest and the depletible interest each had a value of $30,508.49. Depletion was based on a unit recovery basis, whereas depreciation was computed on the basis of a ten-year useful life, instead of the estimated 15-year period of production. Petitioner argues that the allowances should be greater than that determined by respondent. We have found as a fact that the total fair market value of assets distributed did not exceed $37,793.10, of which no more than $30,508.49 represents the total value of depletible and depreciable property. Petitioner has introduced no evidence which would increase the allowances determined *113 by respondent. He has the burden of proving the respondent's determination incorrect. Avery v. Commissioner, supra; Rule 32, supra. Therefore, we have found that the reasonable allowances for depletion and depreciation do not exceed the amount determined by respondent. Decision will be entered for respondent.